T.C. Memo. 2001-116


UNITED STATES TAX COURT


BURIEN NISSAN, INC., ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  9519-98, 12341-98,           Filed May 14, 2001.
        11536-99, 16916-99.


<u>J. Patrick Quinn</u>, for petitioners.

<u>Roy Wulf</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, <u>Judge</u>:  Respondent determined deficiencies and

accuracy-related penalties for Burien Nissan, Inc. (Burien

---

[1]Cases of the following petitioners are consolidated
herewith:  Burien Nissan, Inc., docket No. 16916-99; and Donald
W. Johnston and Jacque C. Johnston, Deceased, docket Nos. 12341-
98 and 11536-99.

Nissan), as follows:

|  |  |  | Accuracy-related Penalty |
| --- | --- | --- | --- |
| Docket No. | Year | Deficiency | Sec. 6662(a)[2] |
| 9519-98 | 1994 | $9,842 | $1,792.00 |
| 16916-99 | 1995 | 37,626 | 7,525.20 |
| 16916-99 | 1996 | 20,371 | 4,074.20 |

Respondent determined deficiencies and accuracy-related penalties for Donald W. Johnston and Jacque C. Johnston, Deceased (the Johnstons), as follows:

|  |  |  | Accuracy-related Penalty |
| --- | --- | --- | --- |
| Docket No. | Year | Deficiency | Sec. 6662(a) |
| 12341-98 | 1994 | $71,837 | $14,367 |
| 11536-99 | 1995 | 116,984 | 23,397 |

After concessions,[3] the issues for decision are: (1) Whether Burien Nissan must amortize noncompetition agreement payments to Mr. Johnston over 15 years pursuant to section 197; (2) whether Burien Nissan's operating loss carryforward for 1994

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Burien Nissan deducted $53,500 that it paid to redeem its own stock on its 1990 and 1991 Federal income tax returns. This deduction increased the amount of Burien Nissan's net operating loss carryforward into 1994. Burien Nissan concedes that it is not entitled to deduct these payments and that the net operating loss carryforward has to be reduced accordingly.

The Johnstons concede that they are not entitled to a capital loss for their 1994 sale of Burien Nissan stock.

Respondent concedes that Burien Nissan is entitled to deduct $23,533 in 1994, $15,000 in 1995, and $11,250 in 1996 in connection with payments to Gerald Buchner. Respondent also concedes the $155,842 proposed adjustment in the Johnstons' 1994 interest income.

should be adjusted to account for additional interest deductions beyond those claimed on its original Federal income tax returns; (3) whether the Johnstons failed to report a $45,483 lump-sum payment pursuant to a noncompetition agreement with Burien Nissan; (4) whether the Johnstons should have reported $290,000 of income in 1995 pursuant to a noncompetition agreement between Mr. Johnston and Matthew B. West, Inc.; and (5) whether Burien Nissan and the Johnstons are liable for the accuracy-related penalties under section 6662(a).

## FINDINGS OF FACT[4]

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Burien Nissan's mailing address was in Seattle, Washington,

---

[4]Burien Nissan and the Johnstons ignored Rule 151(e)(3), which provides, in part:

> In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

Under the circumstances, we have assumed that Burien Nissan and the Johnstons do not object to respondent's proposed findings of fact except to the extent that their statements on brief are clearly inconsistent therewith, in which event we have resolved the inconsistencies based on our understanding of the record as a whole. See Gleave v. Commissioner, T.C. Memo. 1997-276 n.3; see also Estate of Jung v. Commissioner, 101 T.C. 412, 413 n.2 (1993).

at the time of the filing of its petitions. At the time the Johnstons filed their petitions, their mailing address was in Tumwater, Washington.

Mr. Johnston has over 40 years of experience in the automobile industry, and he has owned interests in six automobile dealerships. Mrs. Johnston died in 1995.

The 1990 Sale of Burien Nissan

As of May 24, 1990, Mr. Johnston and Gary McLaughlin owned all the issued and outstanding shares of Burien Nissan. Mr. Johnston owned 96,000 shares or 80 percent of the issued and outstanding shares of Burien Nissan. His basis in those shares as of May 24, 1990, was $484,080. Mr. McLaughlin owned 24,000 shares or 20 percent of the issued and outstanding shares of Burien Nissan. Mr. McLaughlin is Mr. Johnston's son-in-law.

On May 25, 1990, Mr. Johnston and Mr. McLaughlin entered into a stock purchase agreement (1990 stock purchase agreement) with Gerald Buchner, Kenneth Stanford, Herbert Whitehead, and Patrick Watson (purchasers). The 1990 stock purchase agreement provided that Mr. Johnston would sell 34,800 shares of Burien Nissan to the purchasers for $121,327[5] and that Mr. McLaughlin would sell his entire 24,000 shares in Burien Nissan for $83,673.

---

[5] All amounts throughout this opinion are rounded to the nearest dollar.

Option Closing

The 1990 stock purchase agreement provided an option for Burien Nissan to purchase Mr. Johnston's remaining 61,200 shares for $215,000.[6]  Under the terms of the agreement, Burien Nissan was required to pay Mr. Johnston the full $215,000 in monthly installments over a 30-month period beginning in June of 1990.

The agreement also provided for an option closing.  This was defined as the moment when Mr. Johnston transferred his remaining 61,200 shares to Burien Nissan.  The option closing date was to occur within 3 days of Burien Nissan's full payment for the purchase of Mr. Johnston's 61,200 shares.  However, Burien Nissan breached its obligation to pay for the 61,200 shares, and the option closing never occurred.[7]

1990 Noncompetion Agreement

Pursuant to the terms of the 1990 stock purchase agreement, Mr. Johnston was required to execute and deliver to Burien Nissan a noncompetition agreement (1990 noncompetition agreement) at the option closing.[8]  The 1990 noncompetition agreement prohibited

---

[6]These shares amounted to 51 percent of the outstanding Burien Nissan shares.

[7]Mr. Johnston received $53,500 from Burien Nissan in 1990 and 1991.  Mr. Johnston never reported receiving the remaining $161,500 ($161,500 + $53,500 = $215,000) from Burien Nissan pursuant to the 1990 stock purchase agreement option.

[8]Exhibit B of the 1990 stock purchase agreement contained the 1990 noncompetition agreement between Burien Nissan and Mr.
(continued...)

Mr. Johnston from operating a Nissan dealership within 12 miles of the Burien Nissan location for 3 years. Burien Nissan was required to pay Mr. Johnston $355,000 for signing and abiding by the agreement.[9] The option closing never occurred, the 1990 noncompetition agreement was never signed, and Burien Nissan never paid Mr. Johnston any amounts due under the noncompetition agreement.

Breach of the 1990 Stock Purchase Agreement

Burien Nissan breached its obligation under the 1990 stock purchase agreement. In the event of a breach, Mr. Johnston's sole remedy under the 1990 stock purchase agreement was to force a sale of all outstanding Burien Nissan shares to a third party. Mr. Johnston wrote a letter dated October 14, 1993, putting the purchasers and Burien Nissan on notice that they had breached the 1990 stock purchase agreement.

Restructured Sale

On December 13, 1993, Burien Nissan, Mr. Johnston, Mr. McLaughlin, and the purchasers entered into an addendum to the 1990 stock purchase agreement (1993 addendum) and a contract

---

[8](...continued)
Johnston.

[9]The 1990 noncompetition agreement provided that in the event that Burien Nissan was unable to make a single payment of $355,000 to Mr. Johnston, then consideration shall be paid by promissory note. The promissory note required monthly payments of $11,833 until the note was paid in full.

entitled "Supplement to Agreement" (1993 supplement).  Under the terms of the 1993 addendum, Burien Nissan was to redeem Mr. Johnston's capital stock for $434,677 and pay Mr. McLaughlin $65,323.[10]  As of December 31, 1993, the books and records of Burien Nissan reflected an obligation of $434,677 to "Don Johnston and/or Johnston Family Partnership."

Under the terms of paragraph 1.6 in the 1993 supplement, Mr. Johnston was prohibited from competing with Burien Nissan from January 15, 1994 through January 15, 1999, in a geographical area defined as "a line south of Boeing Field running east and west, west east and south King County lines".  Burien Nissan was required to pay Mr. Johnston a fee totaling $352,503 for complying with the noncompetition agreement.  Payment of the fee was to be made as follows:

| | |
|---|---|
| 60 monthly payments of $5,117: | $307,020 |
| Lump sum payment: | 45,503 |
| Total payments: | 352,523 |

Mr. Whitehead called Mr. Johnston to say that there had been a $20 error in the computation of amount due under paragraph 1.6 of the 1993 supplement and that Burien Nissan would pay him $20 less in one of the checks.[11]

---

[10]Burien Nissan negotiated a loan for $500,000 from Primus Financial Services, Inc. (Primus).  The purpose of the Primus loan was to complete the acquisition of Burien Nissan by the purchasers.

[11]Par. 1.6 of the 1993 supplement required 60 monthly
(continued...)

On December 13, 1993, Burien Nissan gave the Johnston family partnership a promissory note for $479,949.

On January 12, 1994, Mr. Johnston and Burien Nissan entered into a Stock Redemption Agreement (1994 stock redemption agreement). Under the terms of the 1994 stock redemption agreement, Burien Nissan agreed to redeem Mr. Johnston's 61,200 shares for the sum of $434,677.

On January 12, 1994, Burien Nissan paid $434,677 to "Don Johnston Johnston Family Partnership." Mr. Johnston surrendered his remaining 61,200 shares to Burien Nissan on January 12, 1994. The Johnstons never reported receiving $434,677, as provided in the 1994 stock redemption agreement.

The 1994 stock redemption agreement also provided that Mr. Johnston agreed to:

> sign over and cancel the outstanding promissory note payable by Burien Nissan, Inc. in the sum of * * * ($479,947) * * *[12]

The promissory note was marked "cancelled" on January 12, 1994.

The 1994 stock redemption agreement also provided that the

---

[11](...continued)
payments of $5,117 (60 x $5,117 = $307,020) plus a lump sum payment of $45,503 ($307,020 + $45,503 = $352,523). However, the agreement only required a total payment of $352,503.

[12]We note that par. 2 of the 1994 stock redemption agreement refers to a promissory note in the amount of $479,947, while the promissory note is in the stated amount of $479,949, a $2 difference.

parties shall sign an "Agreement Termination Purchase and Sale Agreement" (termination agreement).[13]  Mr. Johnston, Mr. McLaughlin, and the purchasers entered into the termination agreement on January 12, 1994.  The termination agreement provided, in part:

> [T]he undersigned parties hereby agree that all further rights, liabilities and responsibilities under the May, 1990 stock [purchase agreement] are terminated, including but not limited to the noncompetition agreement, the sale and purchase of 61,200 shares of Donald Johnston's remaining stock * * *

On February 1, 1994, Burien Nissan issued a check for $45,483 to Mr. Johnston.[14]  Burien Nissan capitalized the payment of $45,483 and amortized the cost over 15 years on its original 1994 Federal income tax return.  Mr. Johnston did not report the $45,483 payment as income.

Burien Nissan deducted the full amount of 11 monthly payments of $5,117 on its 1994 Federal income tax return, 12 monthly payments of $5,117 on its 1995 Federal income tax return,

---

[13]The 1994 stock redemption agreement also provided that the parties "shall sign and enter into the Donald Johnston noncompetition agreement, which document is incorporated herein by reference."  From this, we conclude that the noncompetition agreement was not effective until January 1994, when this agreement was signed and when Mr. Johnston received consideration for entering into the noncompetition agreement.

[14]The difference between the $45,483 check paid on Feb. 1, 1994, and the lump-sum payment of $45,503 due Mr. Johnston pursuant to the 1993 supplement is $20.  As stated earlier, the $20 difference is an adjustment to the payments due Mr. Johnston due to a computational error.

and 12 monthly payments of $5,117 on its 1996 Federal income tax return.

Income Tax Reporting of the Burien Nissan Sale

The Johnstons filed their original 1990 Federal income tax return on or about April 2, 1991.[15]  On Schedule D of their original 1990 income tax return, the Johnstons reported selling Burien Nissan stock on May 25, 1990, as follows:

| | |
|---|---|
| Sales price: | $121,327 |
| Cost/basis: | 237,199 |
| Net long-term capital loss: | (115,872) |

On April 15, 1994, the Johnstons filed a second Form 1040X (second amended 1990 return) to reflect changes in the treatment of the Burien Nissan sale.[16]  On the second amended 1990 return, the Johnstons reported selling Burien Nissan stock as follows:

| | |
|---|---|
| Total sales price: | [17]$319,826 |

---

[15]Norm Smith prepared all income tax returns for Burien Nissan, the Johnstons, the Johnston Family Partnership, and Don Johnston, Inc., for all years from 1988 through 1998.

[16]The Johnstons filed their first Form 1040X amending their 1990 income tax return to reflect changes in the treatment of interest expense on Apr. 15, 1994.

[17]The Johnstons computed their sales proceeds as follows:

| | |
|---|---|
| Proceeds reported on original return | $121,327 |
| Amount due the Johnston Family Partnership which had been paid to Mr. Johnston | 145,000 |
| Payments received in 1990 and 1991 | 53,500 |
| Total | 319,827 |

(continued...)

```
        Less adjusted basis:          484,080
        Net long-term capital loss:  (164,254)
```

The basis amount reported by the Johnstons on their second amended 1990 return was their basis in all of their Burien Nissan stock.

The Johnstons applied a portion of the 1990 long-term capital loss against 1990 income and carried forward the remainder, applying it against income earned in 1991, 1992, and 1993. The Johnstons absorbed the entire remaining capital loss carryforward on their 1993 income tax return. They did not have any capital loss to carry forward to 1994.

The Johnstons filed their 1994 Federal income tax return on or about April 15, 1995. On Schedule D of their 1994 income tax return, the Johnstons reported selling Burien Nissan stock as follows:

```
        Total sales price:           $43,818
        Less adjusted basis:      [18]246,881
        Net long-term capital loss:  (203,063)
```

The Johnstons had no basis in the shares of Burien Nissan they sold in 1994. The Johnstons already had applied their

---

[17](...continued)
We note that a $1 difference exists between the total proceeds amount reported here and the amount reported in the Johnstons' original 1990 Federal income tax return.

[18]On their 1994 Federal income tax return, the Johnstons computed their basis by subtracting the basis reported on their original 1990 income tax return of $237,199 from their basis in the 96,000 shares held on May 24, 1990 ($484,080). The Johnstons disregarded the second amended 1990 return filed on Apr. 15, 1994.

entire $484,080 basis in their Burien Nissan shares against the proceeds that they reported on their second amended 1990 return.

Burien Nissan Amended Income Tax Returns

On March 4, 1998, Burien Nissan mailed Amended U.S. Corporate Income Tax Returns (Forms 1120X) for taxable years 1989, 1990, 1991, 1992, 1993, 1994, 1995, and 1996 to the Ogden Service Center.  The Form 1120X for 1994 reflected a $74,468 increase in Burien Nissan's reported loss for the year.  The increased loss was due to the following reported adjustments:

| Year | Accrue Additional Ransopher Interest | Johnston Family Partnership Interest Adjustment | Sec. 267 Adjustment | Employment Award Adjustment | Reverse Employment Award Prior Amortization Expenses | Total Tax Year Adjustment Expense/ (income) |
|---|---|---|---|---|---|---|
| 1989 | -- | $1,731 | -- | -- | -- | $1,731 |
| 1990 | -- | (65) | -- | -- | -- | (65) |
| 1991 | -- | 9,045 | $(1,438) | -- | -- | 7,607 |
| 1992 | -- | 4,457 | (2,497) | -- | -- | 1,960 |
| 1993 | -- | 5,917 | 29,736 | -- | -- | 35,653 |
| 1994 | $10,000 | -- | 11,483 | $9,783 | $(3,684) | 27,582 |
| Total | 10,000 | 21,085 | 37,284 | 9,783 | (3,684) | 74,468 |

Sale of Aurora Mitsubishi Assets

Mr. Johnston owned 75 percent of the outstanding stock of Don Johnston, Inc.  Mr. McLaughlin and Richard Huntoon owned 5 percent and 20 percent, respectively, of the outstanding stock of Don Johnston, Inc.  Don Johnston, Inc., owned and operated a car dealership doing business as "Aurora Mitsubishi" from 1989 until the sale of the dealership.

On October 28, 1994, Matthew B. West, Inc., and Don Johnston, Inc., entered into an agreement entitled "Agreement for Sale of Assets" (aurora asset sale agreement).  Mr. Johnston signed the aurora asset sale agreement as president of Don Johnston, Inc.

The aurora asset sale agreement provided, in part:

Donald Johnston, agrees to not compete with Purchaser in the new car automobile business with regard to Mitsubishi Company franchise from a location within King County, Washington, for a period of five (5) years, * * * As consideration for the noncompetition and consulting agreement, Purchaser agrees to pay Donald W. Johnston Two Hundred Ninety Thousand Dollars ($290,000.00), payable on closing.

On January 5, 1995, Matthew B. West, Inc., paid Don Johnston, Inc., $396,181.  This amount included the $290,000 allocated to the noncompetition agreement with Mr. Johnston.  Mr. Johnston executed a bill of sale in his individual capacity,[19] indicating that "in exchange for $290,000.00, Donald Johnston agrees not to compete with Buyer as specified in the Agreement for Sale of Assets."  Mr. Johnston signed a letter dated January 5, 1995, stating that the Buy Sell Agreement had been completed.

---

[19]He also signed the bill of sale in his capacity as president.

A "Recap of Bill of Sale" (recap) provided the following allocation to the purchase:

| | |
|---|---|
| New vehicle inventory | $(6,183) |
| Parts inventory | 174,673 |
| Oil & grease inventory | 1,308 |
| Furniture & fixtures | 50,000 |
| Business taxes | 2,838 |
| Work-in-process and sublet inventories | 754 |
| Prepaid expenses | 6,250 |
| Expense of physical inventory | 176 |
| Goodwill | 10,000 |
| Covenant noncompetition agreement | 290,000 |
| Miscellaneous obligations | (201,349) |
| | 68,468 |
| | [1]396,935 |

[1]We note a $754 difference between the $396,935 bill of sale recap and the $396,181 amount paid by Matthew B. West, Inc., on Jan. 5, 1995.

Mr. Johnston initialed the recap reflecting the allocation of $290,000 to the "Covenant NonCompetition Agreement."

On January 12, 1995, Don Johnston, Inc., paid Mr. Johnston $200,000 and paid Wilson Ford $250,000.[20]  Mr. Johnston signed both Don Johnston, Inc., checks.

Mr. Johnston did not report any income from the noncompetition agreement with Matthew B. West, Inc., on his 1994 or 1995 Federal income tax returns.  Don Johnston, Inc., did not report any income from the noncompetition agreement with Matthew B. West, Inc., on its Federal income tax returns.

Don Johnston, Inc., booked the payments for the noncompetition agreement with Matthew B. West, Inc., as a payable

[20]In 1990, Wilson Ford was an automobile dealership controlled by Mr. Johnston.

to Mr. Johnston on its corporate books.  On the balance sheets (Schedule L, with Detail Statement) of its 1994 and 1995 Federal income tax returns (Forms 1120S), Don Johnston, Inc., reported that it owed Mr. Johnston $290,000 on December 31, 1994, and December 31, 1995.

OPINION

I.  <u>Section 197</u>

The first issue is whether Burien Nissan must amortize noncompetition agreement payments to Mr. Johnston over 15 years pursuant to section 197.  Burien Nissan argues that the noncompetition agreement was entered into in 1990; therefore, it is not a section 197 intangible.  We disagree.

An "amortizable section 197 intangible" must be amortized ratably over a 15-year period beginning with the month in which such intangible was acquired.  Sec. 197(a).  An "amortizable section 197 intangible" is any section 197 intangible acquired by a taxpayer after August 10, 1993,[21] and held in connection with the conduct of a trade or business.  Sec. 197(c)(1).  A covenant not to compete entered into in connection with an acquisition of an interest in a trade or business is a section 197 intangible. See sec. 197(d)(1)(E).

Execution of the 1990 noncompetition agreement was contingent upon the prior occurrence of particular events.  The 1990 noncompetition agreement would be executed if Burien Nissan

---

[21]See Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(g), 107 Stat. 540, for effective date.

purchased Mr. Johnston's remaining 61,200 shares for $215,000 in monthly installments over a 30-month period beginning in June of 1990, and Mr. Johnston transferred the shares to Burien Nissan at the option closing. In this case, the most important event that fixed the parties' obligation to enter into the covenant did not occur. Burien Nissan breached its obligation to make the required payments. Thus, under the terms of the 1990 stock purchase agreement, Mr. Johnston was not obligated to transfer his remaining 61,200 shares at an option closing.[22] Consequently, Mr. Johnston was under no obligation to execute the 1990 noncompetition agreement. Indeed, the 1990 stock purchase agreement was never signed, and Burien Nissan never paid Mr. Johnston any amounts due pursuant to the 1990 noncompetition agreement.

Burien Nissan did not acquire a noncompetition agreement from Mr. Johnston until after the agreement was signed on December 13, 1993, which prohibited Mr. Johnston from operating an automobile dealership in a defined area starting on January 15, 1994.

Petitioners argue that the agreements executed in December 1993 and January 1994 merely amended and supplemented the 1990 stock purchase agreement. We disagree. The termination agreement executed on January 12, 1994, explicitly stated that the parties agreed that the 1990 stock purchase agreement was

_____

[22]The option closing date was to occur within 3 days of Burien Nissan's full purchase of Mr. Johnston's 61,200 shares.

terminated, including but not limited to the noncompetition agreement and the purchase of Mr. Johnston's remaining 61,200 shares of stock. Moreover, the terms contained in the noncompetition agreement ratified on December 13, 1993, were different from the terms contained in the 1990 covenant. Each agreement defined different geographic zones, different time periods, and different payment amounts over different payment schedules. Thus, the later agreement did not add terms that were lacking in the previous agreement; it was a completely different agreement.

We find that the noncompetition agreement was entered into after August 10, 1993. Therefore, we hold that Burien Nissan must amortize the payments made to Mr. Johnston for the noncompetition agreement over 15 years pursuant to section 197.

II. Operating Loss Carryforward

Burien Nissan argues that its operating loss carryforward for 1994 should be adjusted because it is entitled to additional interest deductions beyond those claimed on its original Federal income tax returns.[23] Burien Nissan offered Federal income tax

---

[23]Burien Nissan also asserted that it was entitled to deduct $9,783 in connection with a $20,000 cash payment to Mr. Buchner, as claimed on its 1994 amended Federal income tax return. Burien Nissan's original returns for 1994 through 1996 reflected an amortizable payment of $9,783 in connection with the settlement of the law suit with Mr. Buchner. Respondent conceded that the $9,783 payment was deductible in 1994 and that the amortization payment should be reversed. In connection with the settlement with Mr. Buchner, Burien Nissan amortized $598 in 1994, $652 in 1995, and $652 in 1996. Burien Nissan incorrectly asserted that it was entitled to an amortization reversal of $3,684 in 1994.

(continued...)

returns and amended Federal income tax returns as "prima facie evidence in support [of] its claimed deductions."

Deductions are a matter of legislative grace, and the burden of showing the right to deductions is on the taxpayer.  See Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  The fact that a taxpayer reports a deduction on his income tax return  is not sufficient to substantiate the deduction claimed on it.  See Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Roberts v. Commissioner, 62 T.C. 834, 837 (1974).  A tax return is merely a statement of the taxpayer's claim; it is not presumed to be correct.  See id.

The effect of the proffered income tax returns here is a conclusion, given without any circumstances to gauge its accuracy.  No evidence was introduced to substantiate the accuracy of the deductions taken on the amended returns.  A taxpayer is required to maintain records to substantiate deductions claimed on the tax return.  See sec. 6001.  Basically, Burien Nissan is relying on its own uncorroborated tax returns to substantiate claimed interest deductions in excess of interest deductions previously claimed.  Burien Nissan has failed to carry its burden of proving that it is entitled to the additional interest deductions claimed in its 1994 Federal amended income tax return.

---

[23](...continued)
The correct amount of the employment award reversal is $598 in 1994, $652 in 1995, and $652 in 1996.

Burien Nissan also argued that it was entitled to a net loss carryforward into 1995 based largely on the same reasons asserted for additional deductions for 1994. Burien Nissan has failed to meet its burden for additional deductions in 1995.

III. Lump-Sum Payment

The Johnstons argue that Burien Nissan's $45,483 payment to Mr. Johnston on February 1, 1994, was made to him in his capacity as a partner in the Johnston Family Partnership. According to the Johnstons, the check was an interest payment on a note due to the Johnston Family Partnership; not a payment under the 1993 noncompetition agreement. Therefore, according to the Johnstons, the payment should not be included in Mr. Johnston's taxable income. We disagree.

Gross income includes compensation for services. See sec. 61(a)(1). We have found that "Amounts paid by a purchaser to a seller for a covenant not to compete are ordinary income to the seller since they are tantamount to payments for services." Schmitz v. Commissioner, 51 T.C. 306, 313 (1968), affd. sub. nom. Throndson v. Commissioner, 457 F.2d 1022 (9th Cir. 1972).

The promissory note from Burien Nissan to the Johnston Family Partnership was canceled on January 12, 1994, and the $45,483 check payable to Mr. Johnston was written on February 1, 1994. Burien Nissan did not deduct the $45,483 payment as interest on its original 1994 Federal income return; instead, it

capitalized the payment and amortized the cost over 15 years.[24]

The 1993 agreement, executed on December 13, 1993, prohibiting Mr. Johnston from competing with Burien Nissan, required 60 monthly payments of $5,117 and a lump-sum payment of $45,503. However, due to a computational error, Mr. Whitehead told Mr. Johnston that Burien Nissan would reduce one payment by $20. Burien Nissan paid the full $5,117 in all of the 60 monthly payments. Thus, we conclude that the $45,483 payment to Mr. Johnston on February 1, 1994, was in satisfaction of the lump-sum payment due under the 1993 supplement agreement, executed on December 13, 1993, prohibiting Mr. Johnston from competing with Burien Nissan.

We find that the $45,483 lump-sum payment to Mr. Johnston was paid pursuant to the noncompetition agreement. We hold that Mr. Johnston must include the payment in his 1994 taxable income.

---

[24]Burien Nissan asserted that it made an error on its 1994 Federal income tax return but that it filed an amended tax return for additional interest. As discussed supra, pp. 18-19, Burien Nissan has not established that it was entitled to additional interest deductions in 1994.

IV.  Noncompetition Agreement:  Matthew B. West, Inc.

Mr. Johnston argues that he should not have to recognize $290,000 allocated to the covenant not to compete with Matthew B. West, Inc.  The Johnstons do not dispute that the aurora asset sale agreement included Mr. Johnston's covenant not to compete or that the $396,936 payment from Matthew B. West on January 5, 1995, included the $290,000 allocated to Mr. Johnston's covenant not to compete.[25]  The Johnstons assert, however, that creditors were paid with the proceeds of the sale and that Mr. Johnston was a bona fide creditor for the sum of $200,000 that he loaned to Don Johnston, Inc.[26]  In short, the Johnstons are attempting to: (1) Assign $290,000 of the sales proceeds to Don Johnston, Inc., and (2) then reallocate or recast the payment to Mr. Johnston individually as a return of capital rather than compensation.

---

[25]Although the Johnstons stipulated that Johnston, Inc., received $396,181 on Jan. 5, 1995, from Matthew B. West, Inc., they argue on brief that it received $396,936 from the sale.  We cannot account for the $755 difference, which for our purposes, is irrelevant.  We note, however, that the same $755 difference ($754 after accounting for rounding) exists between the bill of resale recap and the amount paid by Matthew B. West, Inc., on Jan. 5, 1995.  See supra note 20.

[26]The Johnstons assert that Don Johnston, Inc., borrowed $250,000 from Wilson Motor Co. on Nov. 9, 1992.  Mr. Johnston testified that he had "funds in at Wilson Ford" and that it was his personal funds with Wilson Ford that were used to make the loan from Wilson Ford to Don Johnston, Inc.  On brief, the Johnstons indicate that Wilson Motor Co. was wholly owned by Donald Johnston.  We note, however, that the exhibits referenced by the Johnstons on brief do not support Mr. Johnston's assertion that he had personal money in Wilson Motor Co. and that, in turn, his personal money was used to lend Don Johnston, Inc., $250,000.

Regardless of who received the income attributable to the covenant not to compete, the true earner of that income is liable for the tax on it and cannot escape that tax by assigning the income to another taxpayer. See Lucas v. Earl, 281 U.S. 111 (1930). In the instant case, Mr. Johnston in his individual capacity, not Don Johnston, Inc., agreed to refrain from competing in the new car automobile business. Consequently, Mr. Johnston in his individual capacity must recognize the income attributable to that promise. See Chiappetti v. Commissioner, T.C. Memo. 1996-183.

The parties stipulated that the $396,181 payment by Matthew B. West, Inc., included $290,000 allocated to the noncompetition agreement with Mr. Johnston. The presidents of both Don Johnston, Inc., and Matthew B. West, Inc., signed a letter on the same day that the payment was made indicating that the purchase had been completed satisfactorily between both parties. Mr. Johnston initialed a "Recap of Bill of Sale" reflecting the allocation of $290,000 to the "Covenant NonCompetition Agreement". Accordingly, we find that Mr. Johnston may not challenge the tax consequences of the agreement, which he voluntarily and knowingly made. We hold that Mr. Johnston must include the $290,000 in his 1995 income.

## V. Accuracy-Related Penalty

Respondent determined that both Burien Nissan and the Johnstons were liable for an accuracy-related penalty under section 6662(a). Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to a taxpayer's negligence or disregard of rules or regulations, or any substantial underpayment of income tax. See sec. 6662(a), (b)(1) and (2).

Section 6662(c) provides that the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. The Commissioner's determination that a taxpayer was negligent is presumptively correct, and the burden is on the taxpayer to show lack of negligence. See Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337. We sustain respondent's determination of the accuracy-related penalty under section 6662(a) and (b)(1) for the following reasons: Burien Nissan and the Johnstons provided no direct evidence regarding the negligence penalty to rebut the presumption of correctness, and the evidence that is in the record tends to indicate a disregard of the rules and regulations. See Rethorst v. Commissioner, T.C. Memo. 1972-222, affd. 509 F.2d 623 (9th Cir. 1974).

No accuracy-related penalty shall be imposed with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. See sec. 6664(c)(1). Burien Nissan and the Johnstons claim that a reasonable person would have taken a similar position in their income tax returns. We have already rejected Burien Nissan's explanations for deducting monthly payments to Mr. Johnston for complying with the noncompetition agreement, and Burien Nissan has conceded that it cannot deduct the cost of redeeming stock it purchased from Mr. Johnston.

With regard to the Johnstons, no legal authority was provided to justify the omission of $45,483 in income in 1994 and $290,000 from income in 1995. We rejected the Johnstons' arguments as to why they failed to report these items, and the Johnstons conceded that they were not entitled to a capital loss for their 1994 sale of Burien Nissan stock.

Burien Nissan and the Johnstons also argue that the accuracy-related penalties should be waived because there was a reasonable basis for their income tax positions since they relied on the advice of a tax adviser. Reliance on professional advice does not necessarily demonstrate reasonable cause and good faith. See sec. 1.6664-4(b)(1), Income Tax Regs. In order for a taxpayer's reliance on advice to be reasonable so as to negate a

section 6662(a) accuracy-related penalty, this Court requires that the taxpayer prove by a preponderance of the evidence that the adviser was a competent professional who had sufficient expertise to justify reliance; the taxpayer gave the adviser the necessary and accurate information; and the taxpayer actually relied in good faith on the adviser's judgement. See Neonatology Associates v. Commissioner, 115 T.C. 43 (2000).

We are not convinced that petitioners reasonably relied on their return preparer in reporting the items in issue. The record does not contain evidence of what specific information Burien Nissan and the Johnstons gave their return preparer. Indeed, we have found that petitioners mischaracterized the key transactions in this proceeding, and there is every reason to believe that they made the same representations to their return preparer.

Accordingly, we find that petitioners have failed to prove that any portion of their underpayments was due to reasonable cause or that substantial authority existed for Burien Nissan's and the Johnstons' various tax positions. We hold that Burien Nissan and the Johnstons are liable for the accuracy-related penalties under section 6662(a) and (b)(1) for the years in issue. Respondent also determined that Burien Nissan and the Johnstons are liable for the accuracy-related penalty for substantially underpaying their income tax liability for the

years in issue under section 6662(a) and (b)(2).  To the extent that a computation under Rule 155 indicates that a substantial underpayment of tax within the meaning of section 6662 exists, then we sustain respondent's determination.  Of course, the 20-percent penalty under section 6662 applies only once for each taxable year.  See sec. 1.6662-2(c), Income Tax Regs.

To reflect the foregoing and the parties' concessions,

<u>Decisions will be entered pursuant to Rule 155 in docket Nos. 9519-98, 12341-98, and 16916-99.</u>

<u>Decision will be entered for respondent in docket No. 11536-99.</u>